NAUMKEAG STEAM COTTON CO. v. UNITED STATES.

No. L–327.

Court of Claims.
Jan. 9, 1933.

James S. Y. Ivins, of Washington, D. C. (Kingman Brewster, O. R. Folsom-Jones, and Richard B. Barker, all of Washington, D. C., on the brief), for plaintiff.

Charles B. Rugg, Asst. Atty. Gen. (Lisle A. Smith, of Washington, D. C., on the brief), for the United States.

Before BOOTH, Chief Justice, and GREEN, LITTLETON, WILLIAMS, and WHALEY, Judges.

BOOTH, Chief Justice.

The Commissioner of Internal Revenue, upon a recomputation of the plaintiff's tax liabilities for the years 1919, 1920, and 1921, determined that the plaintiff had overpaid its taxes for those years in the aggregate sum of $295,150.59. The commissioner credited these determined overpayments to the liquidation of deficiency assessments which he had made against the plaintiff for the years 1917 and 1918.

The plaintiff sues to recover the amount of the credit, together with interest thereon.

The plaintiff's books were kept on the basis of a fiscal year ending November 30, and all its tax returns were made upon that basis.

The plaintiff made timely tax returns for the years 1916, 1917, and 1918, and paid the taxes shown to be due thereon for each of those years.

On December 19, 1922, the Commissioner of Internal Revenue wrote the plaintiff that an audit of its tax returns for the years 1916, 1917, and 1918 disclosed a deficiency in its tax liability for those years of $349,631.84. The deficiency for the year 1916 was $5,781.35. The statute of limitations for the assessment of the tax for that year having then expired, the plaintiff filed a waiver as to that year.

The commissioner signed a deficiency assessment list for the years in question on February 8, 1923, and notice and demand for the payment of the taxes so assessed, $349,631.84, was mailed to the plaintiff on February 23, 1923.

Plaintiff filed timely income and profits tax returns for the years 1919, 1920, and 1921, and the taxes shown to be due on such returns were paid.

Immediately upon the receipt of the deficiency assessment notice and demand from the commissioner for the payment of the additional taxes for the years 1916, 1917, and 1918, the plaintiff prepared, and on March 5, 1923, filed, amended tax returns for the years 1919, 1920, and 1921. The amended returns were made upon the same method of computation of its tax liability for those years as the commissioner had used in his determination of deficiency assessments for the years 1916, 1917, and 1918, and showed that the plaintiff had overpaid its taxes for the years 1919, 1920, and 1921 in the aggregate sum of $306,391.68. Concurrently with the filing of its amended returns for the years in question, the plaintiff filed on Form 843 claims for credit for the full amount of the overpayment of its taxes for the years 1919, 1920, and 1921, as shown by its amended returns against the deficiency assessments which the commissioner had made against it for the years 1917 and 1918. The plaintiff in the claim for credit pointed out with particularity the application of the overpayments to the deficiencies for each of the years 1917 and 1918, computed precisely the extent to which the credit would liquidate the deficiency assessments for 1917 and 1918, and inclosed its check for $37,458.81 in payment of the balance of the taxes due for those years. It also, on March 6, 1923, paid the $5,781.35 deficiency assessment for the year 1916. These payments, $37,458.81 and $5,781.35, together with the sum of $306,391.68, the total overpayment for the years 1919, 1920, and 1921, as shown by the plaintiff's amended returns, totaled $349,631.84, the exact amount of the deficiency assessments for the years 1916, 1917, and 1918.

Upon the receipt of plaintiff's amended returns for 1919, 1920, and 1921 and its requests for credit of overassessments disclosed therein, the commissioner caused an investigation and audit of these returns to be made, and on May 15, 1924, acting upon the audit of a designated revenue agent filed February 12, 1924, advised the plaintiff by registered mail that its income and profits tax returns for the fiscal years 1919, 1920, and 1921 disclosed an aggregate overassessment of $295,196.75, and on August 15, 1924, signed and transmitted to the collector a schedule of overassessments, with instructions to the collector to enter all or any portion of said sum as a credit upon outstanding and unpaid taxes of former years. This the collector did by crediting this sum in payment, in so far as it extended, upon plaintiff's unpaid deficiencies for 1917 and 1918.

The commissioner received in due course from the collector the schedule of overassessments and the collector's schedule of refund and credits, whereupon the commissioner signed his authorization to the disbursing clerk of the Treasury Department February 19, 1925. This schedule did not list any amount to be refunded plaintiff.

Plaintiff, on April 6, 1925, received the commissioner's certificates of overassessments for the years 1919, 1920, and 1921. The overassessments for these years, after due allowance of abatement and credit claims theretofore filed, together with the application of the overassessments as a credit upon the unpaid deficiencies for the years 1916, 1917, and 1918, left due and unpaid upon plaintiff's tax liability for the years involved the sum of $11,241.09 on the 1918 tax account, and on February 4, 1925, the plaintiff paid to the collector this sum, with the added legal interest due thereon, without protest or objection.

The plaintiff contends that sections 607 and 609 of the Revenue Act of 1928 (26 USCA §§ 2607, 2609), rendered void the credit made against plaintiff's tax liability for its unpaid deficiencies for the years 1917 and 1918, and therefore under the Bonwit Teller & Company Case, 283 U. S. 258, 51 S. Ct. 395, 75 L. Ed. 1018, plaintiff is entitled to recover the full amount, with interest, of the overpayments made upon its tax returns for 1919, 1920, and 1921.

The pertinent provisions of the Revenue Act of 1928, 45 Stat. 874, 875, are as follows:

"Sec. 607. Any tax (or any interest, penalty, additional amount, or addition to such tax) assessed or paid (whether before or after May 29, 1928 [the enactment of this act]) after the expiration of the period of limitation properly applicable thereto shall be considered an overpayment and shall be credited or refunded to the taxpayer if claim therefor is filed within the period of limitation for filing such claim."

"Sec. 609. Erroneous Credits

"(a) Credit against Barred Deficiency. Any credit against a liability in respect of

any taxable year shall be void if any payment in respect of such liability would be considered an overpayment under section 2607 [607]. * * *

"(c) Application of Section. The provisions of this section shall apply to any credit made before or after May 29, 1928 [the enactment of this act]."

The Commissioner of Internal Revenue signed the schedule of refunds and credits on February 19, 1925, more than five years subsequent to the date of the filing of plaintiff's returns for the fiscal years 1917 and 1918, and if this act alone determines the issue in this case the plaintiff would be entitled to recover. Both parties to the suit concede this to be the case.

The defendant, however, contests the right of recovery, and grounds its defense upon two legal propositions: First, it interposes the rule of equitable or quasi estoppel, and, secondly, that plaintiff's claims for credit timely filed are tantamount to and have the effect of a consent in writing by the taxpayer to a collection of the tax after the statute of limitations had run; in other words, it is the equivalent of the written consent required by section 250 (d) of the Revenue Act of 1921, which provides in part that income and profits taxes due under any return made thereunder "shall be determined and assessed within five years after the return was filed, unless both the Commissioner and the taxpayer consent in writing to a later determination, assessment, and collection of the tax."

A great number of cases and authorities are cited in the briefs covering the rule as to estoppel, equitable estoppel, and waiver. We need not review them, in view of the fact that this court in a recent opinion had occasion to express its opinion upon this identical subject in the case of Ralston Purina Company v. United States, 58 F.(2d) 1065, 1067, decided June 6, 1932. In this case the court said:

"But for the plaintiff's telegram to the commissioner the additional tax for the fiscal year 1918 would have been collected or a distraint proceeding for the collection thereof would have been begun prior to the expiration of the limitation period of five years after the return for 1918 was filed on June 16, 1919. When the overpayment of $68,724.90 for the fiscal year 1918 was determined on November 3, 1924, and formally allowed on March 7, 1925, the government retained $23,846.88 thereof, as the plaintiff had requested and agreed should be done, and the balance of $44,878.02 was duly refunded to plaintiff, together with interest of $17,051.-

26. Plaintiff was duly notified of the action taken. It made no objection thereto and for more than five years thereafter acquiesced in the action which had been taken. In these circumstances it is our opinion that plaintiff is estopped to assert that the government had no right to retain that portion of the 1919 overpayment equal to the additional tax due for 1918. In Dickerson v. Colgrove, 100 U. S. 578, 580, 25 L. Ed. 618, the court said:

" 'The estoppel here relied upon is known as an equitable estoppel, or estoppel in pais. The law upon the subject is well settled. The vital principle is that he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden. * * * There is no rule more necessary to enforce good faith than that which compels a person to abstain from asserting claims which he has induced others to suppose he would not rely on. The rule does not rest on the assumption that he has obtained any personal gain or advantage, but on the fact that he has induced others to act in such a manner that they will be seriously prejudiced if he is allowed to fail in carrying out what he has encouraged them to expect.'

"The relief of equitable estoppel is administered in favor of one who has been induced to alter his line of conduct with respect to the subject matter in controversy so as to have foregone some right or remedy which he otherwise would have taken. Under the doctrine of equitable estoppel, a person is held to a representation made or a position assumed, where otherwise inequitable consequences would result to another, who, having the right to do so under all the circumstances of the case, has, in good faith, relied thereon. Cf. Lucas v. Hunt (C. C. A.) 45 F.(2d) 781; Louis Werner Saw Mill Co., 26 B. T. A. 141, decided May 24, 1932. Although this case is not a suit in equity but is one at law in assumpsit, however an assumpsit of this kind is of an equitable nature, New York Life Insurance Co. v. Anderson (C. C. A.) 263 F. 527, and the defendant may rely upon any defense which shows that the plaintiff in equity and good conscience is not entitled to recover in whole or in part. Myers v. Hurley Motor Co., 273 U. S. 18, 47 S. Ct. 277, 71 L. Ed. 515, 50 A. L. R. 1181; section 274b, of the Judicial Code, section 398, US CA tit. 28."

In the case of Daube v. United States (D. C.) 1 F. Supp. 771, the court's opinion, announced November 14, 1932, in part states:

"The argument made on behalf of plaintiff assumes that the case at bar is one in which the government, after action to collect the tax was barred, initiated some kind of proceedings to obtain its payment. On the contrary, the plaintiff initiated proceedings to have money which belonged to him and was held by defendant applied on the tax debt. The direction to make the application was made before the expiration of the statute of limitations. It is true that the period of limitation as to a part of plaintiff's taxes had expired when the application was made, but that does not alter the situation. The direction to apply the overpayments on the tax still unpaid had not been withdrawn. In the case of Stange v. United States, 282 U. S. 270, 51 S. Ct. 145, 75 L. Ed. 335, the Supreme Court, in affirming the decision of this court (68 Ct. Cl. 395), held that a waiver filed after the period of limitations had expired was not ineffective, and that, by reason of the waiver, money paid on a tax which was barred by the statute of limitations, could be retained by the government. Such a holding would not have been made if the Supreme Court considered that the debt had been completely extinguished by the statute of limitations."

The facts exhibit that on February 23, 1923, the plaintiff received notice and demand for the payment of the additional taxes assessed upon its 1916, 1917, and 1918 returns. This proceeding was within the statute of limitations; the five-year limitation for the collection of the taxes for 1917 expired March 31, 1923, i. e., one month and eight days after the notice and demand for payment had been served upon the plaintiff, and we are warranted in the assumption that the commissioner would have proceeded to collect such additional tax if the plaintiff did not take some action to prevent the same.

The plaintiff's response to the commissioner's demand for payment appears in the amended returns which it filed for the years 1919, 1920, and 1921, showing a reduction in its tax liability for the years 1919, 1920, and 1921, and the claims for credit filed therewith. The amended returns disclosed a reduction in its tax liability for the years 1919, 1920, and 1921 of $306,391.68, and the claims for credits set forth in detail plaintiff's computation of its tax liability for the six years mentioned, and requested that the sum of the overassessments for the years 1919, 1920, and 1921 be credited in payment of the deficiencies due and unpaid for the years 1916, 1917, and 1918. Plaintiff's computation of its total tax liability on this date admitted that after allowing credits of its overassessments in payment of deficiency taxes there still remained a balance due the government of $37,458.81 and in payment of the same enclosed its check with the amended returns and credit claims. The amended returns and credit claims were filed on March 5, 1923, twenty-six days prior to the expiration of the five-year period applicable to the 1917 return.

The plaintiff's intervention in the way just narrated clearly discloses that it was its intention and desire to liquidate its tax liability in the manner requested. Plaintiff did not want the commissioner within twenty-six days to compel it to pay in cash $260,227.35, with interest thereon, the total amount of its additional taxes determined for the years 1916, 1917, and 1918, when it claimed and had reason to believe an overassessment for 1919, 1920, and 1921 would practically absorb this liability by way of credit. The action which the plaintiff took was for the express purpose of forestalling a forced collection in the way the commissioner would have proceeded had the plaintiff's credit claims never been filed. We say this with confidence, for the record reveals the fact that the plaintiff in the compilation of its amended returns, as to its claimed overassessments and credits, computed its tax liability upon precisely the same basis and methods of accounting resorted to by the commissioner in his determination of deficiencies for 1916, 1917, and 1918, and obviously if the method employed to determine a deficiency was sound, the precise method was available to determine overassessments. (See next to last paragraph of finding 11.) We are to presume the commissioner would have performed his duty.

It was at the request and demand of the plaintiff that immediate payment of the additional taxes for 1916, 1917, and 1918 were not enforced. The plaintiff's actions and procedure set in motion the indispensable accounting processes of the bureau, which the plaintiff well knew exacted time in investigation of claims involving such substantial sums. The plaintiff was alone concerned over the liquidation of its total tax liability for the years involved, and was seeking a final settlement of the same, irrespective of technical procedure, and was perfectly content to submit the question to the commissioner upon the terms and conditions set forth in its claims, without raising or preferring a single objection of any kind or character until more than seven years thereafter.

The commissioner did not institute distraint proceedings for the collection of the additional taxes for 1917 subsequent to

plaintiff's action in filing amended returns for 1919, 1920, and 1921 and credit claims concurrently therewith. On the contrary, he caused an investigation and audit to be made of plaintiff's returns for these' years by an agent of the bureau, and on February 12, 1924, the agent reported for, the three years an overassessment of plaintiff's taxes in the sum of $295,196.75, and later by proper and unchallenged procedure this sum of money was duly credited in payment of plaintiff's additional taxes due and unpaid for the years 1917 and 1918. This is not all, for technically the schedule of refund and credit claims prepared by the collector and transmitted by him to the commissioner finally became effective on February 19, 1925, and of course this schedule, bearing the authorization of the commissioner to the disbursing clerk of the Treasury Department, disclosed no refund due the plaintiff. On the contrary, the certificate of overassessment mailed the plaintiff showed a balance of $11,241.09 remaining after the credit of the overassessments for 1919, 1920, and 1921, due and unpaid by the plaintiff to the government on its 1918 tax account, and the plaintiff on February 4, 1925, seven months and fourteen days after the statute of limitations for the collection of this sum had expired, paid the full amount without protest or objection to the commissioner in final liquidation of its tax liability for the years involved, and which sum is not now claimed as a part of the judgment in this case.

On July 31, 1930, five years, five months, and twenty-seven days after the credits had been made as stated herein, the plaintiff protested and demanded the refund of the sum of overassessments for 1919, 1920, and 1921, on the ground that the statute of limitations precluded the commissioner from making the same. The refund claim was denied. This suit followed on August 8, 1930, almost five and one-half years after the credits had been entered and allowed.

The facts, we think, bring this case within the doctrine of estoppel or equitable estoppel, established and discussed in the citations heretofore cited.

The doctrine of equitable estoppel is predicated upon the fact "that it would be unconscionable to permit a person to maintain a position inconsistent with one in which he has acquiesced or of which he has accepted any benefit." If a person is induced by another's acts and conduct to do what he would not otherwise have done, or, as is said, if he abstained from doing what he would have done, the person inducing such conduct may not suddenly change his attitude to the injury of the other.

We are unable to perceive barriers in the revenue acts which preclude the operation of the doctrine of quasi or equitable estoppel. The courts have sustained its application when properly invoked. In this case the plaintiff in every respect acquiesced in the action of the commissioner as to its tax liability. It could not have done less, for its tax liability was adjusted in the way the plaintiff sought to have it adjusted. There were no protests, no claims for refund of overassessments, no demands for refund filed until just prior to the expiration of the six-year statute of limitation, when the plaintiff suddenly as an obvious afterthought concluded to assert a claim predicated upon the strict letter of the revenue laws without disavowing in the slightest degree that the entire transaction had been long since adjusted and settled in pursuance of mutual and satisfactory proceedings between it and the commissioner, irrespective of limits of time.

Beyond a doubt the instant case is a conspicuous one for the application of the doctrine, for if the plaintiff recovers, its belated change of position enables it to not only recover $295,150.59, the amount stated in its petition, but interest thereon for a period of many years, during which time it acquiesced in the settlement made and does not now assert or claim that the additional taxes assessed for the years 1916, 1917, and 1918 were unlawfully determined or liquidated in opposition to its request and demand.

The established general procedure of the Bureau of Internal Revenue with respect to claims for credit is not of significance in this case. The plaintiff attempts to show that what was done by it and the commissioner was in accord with a general procedure uniformly and universally adopted as to all claims for credit by the bureau, and that no act of the plaintiff diverted the commissioner from doing what he would have done in any event. The facts of record do not sustain the contention; the plaintiff not only did the unusual thing of acknowledging at once liability for the deficiency taxes assessed for the years 1917 and 1918, but within the statutory period of limitation forwarded its check in claimed liquidation of its total tax liability, both as to deficiencies and overassessments. This could not have been done under any other theory and for any other purpose, and it could not have had any other effect than to stay the immediate collection by the commissioner of the deficiencies assessed. One's intention is deducible from conduct,

136

and the position assumed by the taxpayer in this case clearly indicates that it was not only desirable but extremely important from its relationship to a tax liability that the commissioner accept at once its method of discharging the same, irrespective of established procedure or what might or might not have been done in the absence of such conduct upon its part.

If an ex parte telegram dispatched by a delinquent taxpayer requesting departure from an established system in the bureau—which request was granted—is sufficient to invoke the principle of equitable estoppel, and this court has held that it is, it is difficult indeed to withhold the application of the rule in a case where the taxpayer files a more detailed and formal request for credit, which on its face acknowledges a tax liability, points out a way in which it can be paid, requesting that the way pointed out be adopted, and at the same time sends a check for what is an admitted balance due upon the account as stated by the taxpayer itself. We think the taxpayer knew what it did would forestall immediate collection of the deficiencies and that it was so done for that express purpose. We say this deliberately, for the record discloses that what was done was approved and acquiesced in by the taxpayer for years, and no attempt was made to repudiate the position thus assumed coincident with the transaction, or even afterwards until it had almost passed beyond the six-year statute of limitation.

The facts in this case distinguish it from the principles involved in the case of Bowers v. New York & Albany Lighterage Co., 273 U. S. 346, 47 S. Ct. 389, 71 L. Ed. 676, and the case of Russell v. United States, 278 U. S. 181, 49 S. Ct. 121, 73 L. Ed. 255. The difference, we think, is marked. Herein we have the government refraining from distraint or suit for the collection of the taxes because of the request of the plaintiff contained in a proposed settlement prior to the expiration of the statute of limitations, and the additional fact that the plaintiff not only consented to the application of the credit after the expiration of the statute, but voluntarily paid a balance then due but barred by the statute and not included in the judgment herein sought.

In our opinion sections 607 and 609 of the Revenue Act of 1928, heretofore quoted, apply in cases where the commissioner acts independently of the taxpayer in the absence of a request, or conduct upon the part of a taxpayer, to proceed differently. The sections relied upon are not, we think, conclu-

sive in cases where a taxpayer of his own volition and at his own request seeks and consents within the statutory period to have overassessments credited against deficiencies after the statute has run, and does not thereafter, with full knowledge of his rights, contest the allowance nor challenge the legality of the proceedings until a period of time just preceding his right to prosecute a claim at all.

In Bigelow on Estoppel (6th Ed.) p. 30, a citation in defendant's brief, appears the following: "This completes estoppel proper, in substantive law, and brings us to what may be called 'quasi-estoppel.' A party will not be permitted to assume inconsistent positions, and where one has an election between inconsistent courses of action he will be confined to that course which he first adopts."

In Walker v. Commissioner, 23 B. T. A. 1, 6, the opinion in part states: "The taxpayers were on a cash basis of accounting, and in line with the statute above quoted, they did return the profits from this sale 'in the gross income for the taxable year in which received by the taxpayer,' proportioning the profit in accordance with the quoted Regulation. Conceding, for the argument, that the statute and regulation afforded the taxpayers the election of treating the obligations of the purchaser as the equivalent of cash, *the taxpayers otherwise elected; they may not now change that election, particularly since the result would be to throw all of the profit into a year where collection is barred by limitations.* Lucas v. St. Louis National Baseball Club (C. C. A. 8) 42 F.(2d) 984; Rose v. Grant (C. C. A. 5) 39 F.(2d) 340; Alameda Investment Co. v. McLaughlin (C. C. A. 9) 33 F. (2d) 120; Holmes on Federal Income Tax (6th Ed.) 1278." (Italics ours.)

The doctrine of estoppel is invoked and commented upon in the case of Pittsburgh Terminal Coal Corporation v. Heiner (D. C.) 56 F.(2d) 1072, 1076, Prentice-Hall, 1932, pp. 664, 667. The district judge, in delivering the opinion of the court, said: "In our opinion, the notice given by the Commissioner in the instant matter was a sufficient compliance with section 274 (a) of the Act of 1926 (26 USCA § 1048). But, even if we were to admit error in this respect, it still would seem that the complainant is in no position to appeal to a court of equity. By filing its petition for review it affirmed the sufficiency of the notice as to itself. It maintained that position for five years and thus delayed the Commissioner in the collection of the tax due for that period. Had it not filed its petition for review after the notice, or

even had it asserted its mistake in filing it within a reasonable time after doing so, the complainant's bill, looking at it only from the standpoint of the equities involved, would have had considerably more weight than at present, but after accepting the notice as sufficient, and thus disarming the Commissioner, and then delaying for a period of five years before alleging the insufficiency of the notice, it plainly should be held to be estopped from assuming a new position and so obtaining further delay."

We desire also to call attention to the opinion of the Supreme Court in Lewis v. Reynolds, 284 U. S. 281, 52 S. Ct. 145, 146, 76 L. Ed. 293, with reference to a matter which has not been presented. In that case, an assessment was made, after the expiration of the period of limitations, of an income tax upon the property of an estate in charge of an administrator, and upon this tax the commissioner applied money received through an overpayment of the taxes by the administrator resulting from certain deductions allowed. The lower court held that the case was controlled by section 322 of the Revenue Act of 1928 (26 USCA § 2322) and referring thereto said [(C. C. A.) 48 F.(2d) 515, 516]: "The above quoted provisions clearly limit refunds to overpayments. It follows that the ultimate question presented for decision, upon a claim for refund, is whether the taxpayer has overpaid his tax. This involves a redetermination of the entire tax liability. While no new assessment can be made, after the bar of the statute has fallen, the taxpayer, nevertheless, is not entitled to a refund unless he has overpaid his tax. The action to recover on a claim for refund is in the nature of an action for money had and received, and it is incumbent upon the claimant to show that the United States has money which belongs to him."

The Supreme Court stated that it agreed with the conclusion reached by the court below, as stated in the above quotation, and said further: "While the statutes authorizing refunds do not specifically empower the Commissioner to reaudit a return whenever repayment is claimed, authority therefor is necessarily implied. An overpayment must appear before refund is authorized. Although the statute of limitations may have barred the assessment and collection of any additional sum, it does not obliterate the right of the United States to retain payments already received when they do not exceed the amount which might have been properly assessed and demanded."

The only difference between the case at bar and the one from which these quotations are made is that in the Lewis Case, supra, the additional assessment was made for the same year as that upon which the overpayment had been made. In the case at bar the additional assessment was made for a different year. In both there was a reaudit, and the assessment and application of the money received from the overpayment were made after the statute of limitations had run. Sections 607 and 609 of the Revenue Act of 1928 are not referred to in the opinion rendered in the Lewis Case, but it would seem that the Supreme Court regarded money which came lawfully into the hands of the commissioner by reason of the original assessment simply as an item of credit on the general account between the taxpayer and the government and that, although assessment and collection "of any additional sum" might be barred by the statute of limitations, his taxes could be reaudited and the overpayment applied thereon.

We think the petition should be dismissed. It is so ordered.

WHALEY and WILLIAMS, Judges, concur.

GREEN, Judge (concurring).

I concur in the foregoing opinion but think that it might be well to make some further observations upon matters to which no direct reference has been made therein. Necessarily this will have to be done at the risk of some repetition in order to present continuity of thought.

While the case presents some quite interesting questions of law, its determination must rest largely upon the findings of fact made by the court which, with the exception of finding 23 (not included in the court commissioner's report), are accepted by both parties to the case. The plaintiff filed a request for some additional findings, but evidently it was concluded they were not material as no reference was made thereto in argument. The last finding (finding 23) was made by the court and is one of ultimate fact upon all of the evidence in the case. In my opinion it precludes any recovery on behalf of the plaintiff for reasons hereinafter stated.

In connection with this finding it should be stated that the defendant called as a witness on its behalf the collector of the district in which the plaintiff resided and much argument has been presented on both sides, both written and oral, as to what construction should be placed upon the testimony of the collector. Any questions arising upon the

138

argument as to how his testimony should be interpreted are necessarily settled by the findings. The foregoing findings and opinion show that the taxes for the years 1916, 1917, and 1918 were audited by the commissioner and the plaintiff was advised of the results of this audit and the manner in which they had been calculated; that shortly thereafter the commissioner proceeded to assess additional taxes for these years accordingly and a little later sent plaintiff a notice and demand for the payment thereof; that the plaintiff thereupon filed amended returns for the years 1919, 1920, and 1921 computed on the same basis and showing overassessments for which it made claims for credit, the amount of which it requested be applied in part to the satisfaction of the taxes now in controversy. Plaintiff's computation showed $37,458.81 due the government for which a check was inclosed. The collector was advised of this proceeding and thereafter, as finding 13 recites, "took no further action toward the collection of the balance of the tax deficiencies outstanding against the plaintiff for the fiscal years ended November 30, 1917 and 1918, respectively, until the claims for credit were acted upon by the Commissioner of Internal Revenue." The finding further recites that this was in accordance with the general practice of the office of the collector in such cases. To this finding the plaintiff made no exception and it is not now claimed by any one that the additional findings requested by plaintiff with reference to the collector's testimony are in any degree material. Upon this condition of the record the question of what construction should be placed upon the collector's testimony and what weight should be given it can safely rest. Further than this on the controverted point the court did not go in making its findings and its reasons for so doing appear to me to be quite obvious. In this particular case, where the determination of the matters in controversy rested wholly with the commissioner's office, what the collector did is quite important but what he considered was the effect of the regulations and what he thought was the proper construction to place upon them, are, as it seems to me, of no importance whatever. He was under the direction and orders of the treasury, which direction and orders were given by the commissioner's office, and the government is not precluded by any ideas he might have had about the matter. The commissioner could, at any time after the taxes had been assessed and proper notice given, have directed the collector to proceed with the collection thereof. What the prior rulings of the office had been may be a factor in determining such ultimate facts as are stated in finding 23, but it is the province of the court to determine the weight thereof under the circumstances. Departmental rulings have often been inconsistent and ambiguous and not always in accordance with law. I do not think it is necessary to review those which have been cited on behalf of the plaintiff any further than to say that I do not entirely agree with the construction placed thereon by counsel for defendant and think that all questions in connection with their application to the case are completely settled by the findings of the court.

In a case like the one now before the court where the motives of the parties thereto are a very material factor in its determination, the court properly takes into consideration in determining the ultimate facts not only the facts concerning which direct testimony is given but all of the circumstances of the case which bear thereon and throw light upon the motives of the parties. When the evidence was so reviewed, the majority of the court has found in effect that the officials of the commissioner's office were lulled to sleep by the actions of the plaintiff in concurring in the basis of computing the amount of overassessment, in submitting for defendant's consideration a computation thereof, in requesting that the amount thereof so far as necessary be applied upon the payment of the settlement of the taxes in controversy, and filing a claim for such a credit. The court has found that the plaintiff understood very well that time would be taken for such computation and this was evidenced by the fact that after the computation had been made the plaintiff promptly settled the balance although the statute of limitations had expired. Where an account is hanging in the balance, and one party says to another with reference to certain items of credit that they should be applied on another item owing to the first party, and the second party says in effect, "That is right and I ask that you so apply it," then and in such a case the minds of the parties have met as completely as if they had signed and sealed a written agreement; and that, as the majority views it, is the situation which is presented here. The understanding was complete from the time the plaintiff responded to the notice and demand of payment and told the commissioner's office in substance that it was in entire accord with their view of the case and wanted its taxes to be settled accordingly.

In my opinion it is useless to speculate as to what the defendant through the commis-

sioner might have done if the actions of the plaintiff and the circumstances of the case had been different. The argument seems to be that the commissioner's office would have taken no different action if the plaintiff had not substantially agreed to pay the taxes when they were computed. Of this we have no testimony, no findings, nor do I know how it would be possible to introduce competent evidence as to what any individual might do under circumstances which never existed. Under the understanding between the parties as found by the court, the defendant could safely pigeonhole the case until the office had time to properly compute and determine the amount of credit to be given the plaintiff and give no thought to the matter for the time being. The case was completely settled; there was no occasion for any haste in relation to it, no reason on the part of the commissioner's office to doubt that the plaintiff would make good the understanding between them, which its subsequent payment of the balance of the taxes (for which no recovery is now sought) clearly showed existed on its part as well as on the part of the commissioner's office. The commissioner was induced by the acts and conduct of the plaintiff to take the course which he followed and had the right to expect the payment according to the understanding. When the plaintiff, years later, changed attitude, the law, as stated in Dickerson v. Colgrove, 100 U. S. 578, 580, 25 L. Ed. 618, quoted in the majority opinion, is peculiarly applicable. In such cases the plaintiff, having led the defendant to expect payment, could not subject the defendant "to loss or injury by disappointing the expectations" upon which the defendant acted. "There is no rule more necessary to enforce good faith than that which compels a person to abstain from asserting claims which he has induced others to suppose he would not rely on."

It should be carefully kept in mind that in the foregoing opinion of the majority the matter of estoppel is not based merely upon the fact that plaintiff filed a claim for credit. Conceding for the sake of the argument that this alone would not be sufficient, there is still no occasion to discuss that matter. It is the actions of the plaintiff as a whole and all the circumstances of the case as shown by the evidence taken in connection with such actions, which form the basis of the findings in the case and upon which the decision of the court is founded.

One other matter ought to be mentioned. It seems to be contended by counsel for plaintiff in argument that it is impossible for a taxpayer whose taxes were originally properly assessed and computed to make such a payment after the time the statute of limitations has run without having the right to sue and recover it back. Reasoning from the statute, it is argued that any such payment is void and in effect that there are absolutely no exceptions to this rule. I cannot believe that Congress ever intended by the provisions of the statute which are relied upon to provide that a taxpayer who went to the commissioner's office and said to the commissioner, "Some taxes have been properly assessed against me. The time of limitation for collection through your office has expired, but I feel that I am ethically bound to pay these taxes," and thereupon makes payment to the commissioner, could the next day, upon motives not quite so honorable, bring suit to recover the payment. It may be said that such is the language of the act but it is not difficult to find cases in which the literal application of statutes has not been held to apply to cases which obviously were not in contemplation by Congress at the time the statute was enacted.

A conspicuous example is often brought to the attention of this court. In the most sweeping terms, section 3477 of the Revised Statutes (31 USCA § 203) declares all assignments of claims upon the United States to be void unless made after the allowance thereof. Yet the Supreme Court, in Goodman v. Niblack, 102 U. S. 556, 561, 26 L. Ed. 229, held that a voluntary assignment for the benefit of creditors was "such a meritorious act" that it did not come "within the evil which Congress sought to suppress" by the statute referred to and was valid as to a claim against the government. The construction contended for by the plaintiff would lead to such grotesquely absurd results that I hardly think anyone would claim that it was so intended by Congress, notwithstanding it may be within the literal application of the language of the statute.

It is said that at the time when the provision under consideration was placed in the statute, the House bill originally had a provision modifying it somewhat so that it would not apply to cases where claims for credit had been filed but that this was taken out in conference. Whatever this may show with reference to the mere filing of a claim for credit, I think it has no application here because the whole case of defendant, in my opinion, is founded upon the series of transactions that included a request for the application of the overassessment upon the taxes in controversy; and which upon the

whole of the evidence as shown by the findings, constitute an understanding and agreement between the parties.

It is, however, not necessary to pass on the question just considered in order to make a decision in the instant case. If the plaintiff is estopped at all, it is estopped from claiming any benefit under the sections upon which it relies. It is one of the features of quasi or equitable estoppel that it prevents the operation of some provision of law which might otherwise be invoked in favor of the party estopped. I am clearly of the opinion in concurrence with the majority of the court that this estoppel exists and that the plaintiff therefore cannot recover.

LITTLETON, Judge (dissenting).

I cannot concur in the majority opinion dismissing plaintiff's petition on the ground that it is estopped to claim the overpayments for 1919, 1920, and 1921 credited against an additional tax assessed for 1917 and 1918, which credit was allowed and made after the expiration of the statute of limitation within which the tax for 1917 and 1918 could be collected. The plaintiff is held estopped to question the legality of the credit of overpayments against the tax assessed for prior years because it filed claims for credit in which it alleged certain overpayments for 1919, 1920, and 1921, made certain statements therein, and filed amended returns for those years.

From a consideration of the circumstances under which the claims for credit were filed and of the statements contained therein, the stipulation of facts, the testimony introduced, the various statutes and regulations with reference to the filing of claims for credit, the decisions of the Treasury Department, and the long-continued practice of the department and the collectors of internal revenue, I am of the opinion that the doctrine of estoppel is not applicable and should not be invoked in this case.

Throughout this case it should be kept in mind that each taxable year stands alone, Burnet v. Sanford & Brooks Co., 282 U. S. 359, 51 S. Ct. 150, 75 L. Ed. 383, and that the rights and liabilities of the taxpayer and the Government with respect thereto are fixed by the statutes, which prescribe the procedure to be followed, the time within which certain acts of the taxpayer or the Commissioner of Internal Revenue in respect of a particular taxable year or years shall be taken, and the effect thereof upon the rights of the taxpayer or the government.

Section 252 of the Revenue Act of 1918, approved February 24, 1919 (40 Stat. 1085), was the first statute providing for a system of crediting overpayments for one taxable year against a tax that may be due for a different taxable year, and said section was the first provision of law providing for the filing of a claim for credit. Prior to that time sections 3220 and 3228, Revised Statutes (see 26 USCA §§ 149, 157 and notes), provided only for the filing of claims for refund and authorized the commissioner to remit, refund, and pay back taxes erroneously or illegally assessed or collected. Prior to the enactment of the Revenue Act of 1918 the Treasury Department had no system for filing of claims for credit by taxpayers or for the making of credits of overpayments of taxes for a particular period against taxes due for another period. Article 267, Regs. 33, Revised, relating to the Revenue Act of 1916 (39 Stat. 756), as amended by the Revenue Act of 1917 (40 Stat. 300), discloses the only practice in force in the Treasury Department with reference to the payment of claims. That article provided that upon allowance of claims for taxes overpaid warrants would be issued in favor of the party entitled to the money and would be sent by the Treasurer to such party, "but if the claimants are indebted to the United States for taxes, they must be paid before the warrants are delivered." This article was predicated on the Act of March 3, 1875, 18 Stat. 481 (31 USCA § 227), which authorized the Treasury Department to withhold monies due if the person entitled thereto should be indebted to the United States, until the termination of a suit by the government to recover such claimed indebtedness. Section 1006 of the Revenue Act of 1918 (26 USCA § 704) provided that the commissioner, with the approval of the Secretary of the Treasury, shall make all needful rules and regulations for carrying the provisions of this act into effect. Subsequent acts contained the same provision. Prior to the enactment of that act the commissioner had prescribed separate forms, 46 and 47, to be used in making a claim for refund or a claim for abatement, respectively, and had made certain regulations with reference to the filing thereof and as to the information to be contained therein. In Regs. 45, issued and promulgated under the Revenue Act of 1918, the Treasury Department prepared and issued another form, known as Form 47–A, to be used by taxpayers in making claims for credit, which form prescribed the manner in which such claim should be prepared and made, and the in-

formation to be contained therein. Article 1034, Regs. 45, provided that: "Any amount of income, war-profits, or excess-profits tax paid in excess of that properly due shall be credited against any such taxes due from the taxpayer under any other return. To obtain such credit taxpayers should proceed as follows: (1) Where the credit demanded is equal to or less than any outstanding assessment of tax, a taxpayer desiring to obtain such credit shall file with the collector for the district in which his original return was filed a claim on Form 47–A, which shall be sworn to and shall contain the following statements: (a) Business engaged in by claimant; (b) character of assessment; (c) amount of tax paid and for what taxable year; (d) portion of tax under (c) claimed as a credit; (e) unpaid assessment against which credit is asked and for what taxable year; and (f) *all facts regarding the overpayment.*" (Italics supplied.) Said article also provided that where the amount claimed as a credit is greater than the outstanding assessment of tax, the taxpayer desiring to obtain such credit and refund of the balance should file a claim for refund, Form 46, in addition to the claim for credit, and that all the facts regarding the total overpayment should be stated in the claim for refund and a reference made therein to the claim for credit. Article 1035, Regs. 45, provided for the procedure to be followed by the commissioner and the collector in making the credits which was the same as the procedure followed in this case. The 1921 regulations further provided that: "Under no circumstances will a taxpayer be entitled to credit for an alleged overpayment of tax prior to the allowance of such credit by the commissioner. An attempt to take a credit prior to such allowance shall not be held to be the filing of a claim under section 252 of the Revenue Act of 1921." See article 1035, Regs. 62, and T. D. 3154, April 11, 1921.

The revenue act had provided that if any tax remained unpaid after the date when it was due and for ten days after notice and demand by the collector there should be added as a part of the tax the sum of 5 per cent. of the amount due and unpaid, plus interest at 12 per cent. a year, from the time it became due until paid, but that as to any amount which was made the subject of a bona fide claim for abatement the 5 per cent. should not be added and the interest from the time the amount was due until the claim is decided should be at the rate of 6 per cent. a year. Article 1035, above mentioned, relating to credits of overpayments against taxes due, provided that: "The filing of a claim for credit of a tax due under another return shall be subject to the same rules with respect to the addition of interest and penalties as if the taxpayer had filed a claim for abatement of the tax against which credit is desired." Articles 1003 and 1006 of Regs. 45 related to interest and penalties where payment was not made within ten days after notice and demand and where a claim for abatement was filed.

On December 8, 1921, the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, issued and published Treasury Decision No. 3260, 5 C. B. 243, relating to adjustments by credit, in which it was stated that: "Reduction of internal-revenue assessments and adjustments of overpayments of revenues will hereafter be accomplished * * * on the basis of an application submitted by a taxpayer on form * * * 47–A, together with appropriate supporting evidence to be filed in the office of the collector of internal revenue of the district in which the tax is assessed." This provision is contained in article 1033–A, Regs. 62, under the revenue act of 1921. Such Treasury decision contained other provisions relating to abatements and refunds, and the manner in which they would be accomplished, as had been prescribed by article 1034 of Regs. 45, theretofore issued.

Article 261, Regs. 33, revised, under the Revenue Act of 1916, as amended by the Revenue Act of October 3, 1917, which regulation was issued before the statute and the regulations had authorized a system of credits, provided that: "The filing of a claim for abatement of a tax alleged to have been erroneously assessed does not necessarily operate as a suspension of the collection of the tax, or make it any less the duty of the collector to exercise due diligence to prevent the collection of the tax being jeopardized. He should, if necessary, collect the tax and leave the taxpayer to his remedy by claim on Form 46 [for refund]."

In or about January, 1922, the Commissioner of Internal Revenue rendered and published a decision under section 252 of the Revenue Act of 1921 (42 Stat. 268) and article 1034 of Regs. 45 and 62, being I. T. 1373, I–1 C. B. 318, in which it was held that: "The filing of a claim for credit does not necessarily operate as a suspension of the collection of tax or make it any less the duty of the collector to exercise due diligence to prevent the collection of the tax from being jeopardized. He may, if he considers it nec-

essary, collect the tax and leave the taxpayer to his remedy by a claim for refund." This decision, as well as others herein mentioned, was furnished to collectors of internal revenue.

Shortly prior to making the above-mentioned decision the commissioner had made and published a decision, I. T. 1333, I–1, C. B. 305, in which he held that the running of the statute of limitation against the government, as a result of which the government would be precluded from bringing suit or proceedings against the taxpayer, placed the tax in jeopardy. Thereafter, in or about July, 1922, the commissioner made and published a decision known as I. T. 1446, I–2 C. B. 218, under sections 250 of the Revenue Acts of 1918 and 1921 (40 Stat. 1082; 42 Stat. 264), and article 1109 of Regs. 45 and 62, in which he held that when a tax had been assessed within the five years provided by section 250 (d) of the Revenue Act of 1921 the tax so assessed could be collected by means other than a proceeding in court after the expiration of such five-year period. Said decision was as follows:

"The income-tax return of the company was filed February 27, 1917. Notice and demand for additional income taxes due for the year 1916 was mailed by the collector on March 1 and received on March 2, 1922.

"Second notice and demand for the tax was sent on March 10, 1922. The collector has notified the corporation that if the taxes are not paid he will distrain its property.

"Under the provisions of section 250 of the Revenue Act of 1921 taxes for years prior to 1921 must be determined and assessed within five years after the return was filed, and no suit or proceeding for the collection of the tax may be begun after the expiration of such five years. It is contended that in this case neither of these requirements of the statute has been met, and request is made that the collector be instructed to refrain from distraining the property.

"This office is of the opinion that * * * section 250 (d) of the Revenue Act of 1921 * * * refers only to judicial proceedings for the collection of such taxes and not to the summary proceeding by means of distraint authorized by sections 3187 to 3209 of the Revised Statutes of the United States (see 26 USCA §§ 116–138).

"As the additional taxes in question were placed on the assessment list under date of February 24, 1922, it will be seen that such taxes were determined and assessed within the five-year period of limitation provided in section 250 (d) of the Revenue Act of 1921, and that the action of the collector in demanding payment after the expiration of such five years was entirely proper. If payment of the additional assessment of taxes was not made within the prescribed time, the collector may proceed by means of distraint to collect such taxes."

It was the practice of the Treasury Department to obtain a waiver of the statute of limitation by the taxpayer or secure a bond in cases where it was believed collection of the tax would be jeopardized by delay. See section 250 (d) of the Revenue Act of 1921 providing for waivers of the statute of limitation, and the collector's testimony hereafter referred to.

After January, 1922, claims for abatement, credit, and refund, theretofore required by the regulations and rulings of the Treasury Department to be made on separate forms provided for that purpose, were combined into one form, No. 843, which was the form used by plaintiff in this case. After January, 1922, taxpayers making a claim indicated thereon whether it was a claim for abatement, credit, or refund, and filled in only that portion thereof which was required in such cases.

I shall next point out certain matters contained in the claims for credit filed by the plaintiff, with reference to the statements printed thereon by the Treasury Department and inserted therein by the plaintiff, as required by said form and the regulations and rulings of the Treasury Department. The claims were headed:

"Claim For
"Abatement of Tax Assessed
"X Credit against Outstanding Assessments
"Refund of Taxes Illegally Collected
"Refund of Amounts Paid for Stamps"

The letter "X" was inserted by the plaintiff to indicate the nature of the claim. The claim also contained the following printed statement: "Important. Not acceptable unless completely filled in." After showing the name of the taxpayer and its place of business, the claim contained the following; the italicized statements, the dates, and the amounts shown being inserted in the claim by the plaintiff:

"This deponent, being duly sworn according to law, deposes and says that this statement is made on behalf of the taxpayer named, and that the facts given below with

reference to said statement are true and complete:

1. Business in which engaged: *Manufacture of cotton sheeting.*
2. Character of assessment or tax: *Income and excess profits tax.*

| Period | Year |
|---|---|
| From Nov. 30 | 1919 |
| To " 27 | 1920 |

3. Amount of assessment or stamps purchased ............................... $248,039.85
4. Reduction of tax liability requested (income and profits tax).............. 195,636.41
5. Amount to be abated.................... ..........
6. Amount to be refunded (or such greater amount as is legally refundable).. ..........
7. Dates of payment (if statement covers income tax liability, items 8–11, inclusive, must be answered) 2/15/21–5/15/21–8/15/21–11/15/21.
8. District in which return, if any, was filed: *Massachusetts, Boston.*
9. District in which unpaid assessment appears: *None unpaid.*
10. Amount of overpayment claimed as credit .................... 195,636.41
11. Unpaid assessment against which credit is asked: period from—*Fiscal year ended Dec. 1, 1917*.................... 21,341.98

"Deponent verily believes that this application should be allowed for the following reasons: *As per statement attached hereto.*"

The remaining statements which were written into each of the claims for credit by the plaintiff are set forth in finding 11. The practice of the Treasury Department was that "no credit will be allowed after the expiration of the statutory period of limitation applicable to the filing of a claim therefor except upon one or more of the grounds so set forth in a claim." See T. D. 4265.

The registered letter of May 15, 1924, from the commissioner to the plaintiff, mentioned in finding 14, Exhibit I to the stipulation of facts, setting forth the result of the commissioner's determination upon the claims for credit allowing the same to the extent of $295,196.75 and rejecting them to the extent of $11,241.09, contained the following statement: "Under no circumstances should payment of the amount rejected be made until a bill is received from the collector of internal revenue for your district." At the time the aforementioned registered letter of May 15, 1924, was mailed to plaintiff the statute of limitation relating to the collection of the tax assessed for the fiscal year ending November 30, 1918, had not expired and did not expire until June 16, 1924, for the reason that plaintiff's return for said fiscal year ending November 30, 1918, was filed June 16, 1919. Notwithstanding this, the government delayed until February 19, 1925, to make the credit, which date was eight months after the overpayments had been determined. The reason for this, I think, is plain. The government was not relying upon plaintiff's claims for credit as an agreement to a settlement of the tax accounts for the several years, irrespective of any statute of limitation, for the Treasury Department had long prior thereto rendered and published its opinion that the filing of a claim for credit would not operate as a suspension of collection of the tax if it should appear to be in jeopardy, and had rendered and published its opinion that the five-year statutory limitation on collection related only to a judicial proceeding to collect, and where the assessment had been made in time collection could be made after the expiration of the statutory period of limitation of five years. It seems manifest that this was the primary cause of the delay in making collection.

The aforementioned general practice and procedure of the Treasury Department of taking no steps to collect an outstanding assessment of tax where a claim for credit was filed appear to have continued in all cases until February 6, 1925, when Treasury Decision No. 3279, IV–1 C. B. 375, was made and published, which changed this practice only with respect to deficiencies assessed after June 2, 1924. In this Treasury Decision it was held that: "In any case where a taxpayer presents a claim for credit to be applied against taxes assessed on or after June 2, 1924, the collector will inform him that such claim will not operate as a stay of the collection of the tax."

In G. C. M. 5739 VIII–1 C. B. 127, being a decision made and published about January, 1929, it was held by the Treasury Department that where a taxpayer filed "a claim for credit for the years 1916 and 1918', with a request that part of an alleged overpayment of income taxes for those years be applied as a credit against the unpaid 1917 assessment," which was allowed after the period of limitation had expired within which collection of the 1917 tax could be made, the credit was illegal and the amount of the overpayment determined on the claim for credit must be refunded.

In G. C. M. 6296, VIII–2 C. B. 152, an opinion made and published by the general counsel of the Bureau of Internal Revenue, it was held that section 611 of the Revenue Act of 1928 (26 USCA § 2611), was not applicable to the case where a claim for credit of an overpayment had operated to stay the collection of an outstanding assessment. This opinion was as follows:

"An opinion is requested as to whether a portion of an overpayment of tax made by the taxpayer for the year 1918, which was applied against an outstanding additional tax for 1917, should be refunded to the tax-

payer in accordance with the provision of section 607 of the Revenue Act of 1928 (26 USCA § 2607).

"On August 8, 1923, within the statutory period of limitation as extended by a waiver executed by the taxpayer with respect to the collection of 1917 taxes, the taxpayer filed a claim for credit, requesting that an overpayment of tax for the year 1918 be applied against the additional tax due by the taxpayer for the year 1917. * * * *Under the procedure in effect at that time the filing of a claim for crediit operated to stay the collection of the outstanding tax against which the alleged credit was requested to be applied in the same manner that a claim for abatement operated to stay collection.* The opinion of this office is requested as to whether the taxpayer's claim for refund may be rejected, under the provisions of section 611 of the Revenue Act of 1928, by reason of the filing of the claim for credit by the taxpayer under the circumstances set forth above. (Italics supplied.)

"In many cases in which taxes were duly assessed prior to the enactment of the Revenue Act of 1924 (43 Stat. 253) claims in abatement were filed by taxpayers in which it was alleged that the outstanding taxes sought to be abated had been erroneously and illegally assessed, and collection of these taxes was frequently delayed, in order that these abatement claims might be considered, until after the running of the statute of limitations. Section 611 of the Revenue Act of 1928, being an exception to the general rule set out in section 607 with respect to payments made after the expiration of the period of limitation against the United States, was intended to cover those cases in which collection of taxes was stayed by reason of the filing of such claims in abatement. It may be conceded that at one time the filing of claims for credit by taxpayers likewise had the effect of staying the collection of outstanding taxes. It is to be noted, however, that it is expressly provided in section 611 that before a tax paid after the running of the statute of limitations may be considered not to constitute an overpayment which must be refunded it must appear that a claim in abatement was filed and that collection of the tax was stayed. No mention is made in section 611 of the filing of a claim for credit by the taxpayer. A claim for credit is not a claim that the taxpayer owes no tax. In requesting that an overpayment for another period be applied against a certain outstanding tax the taxpayer in effect admits the correctness of the outstanding assessment. Consequently, section 611 of the Revenue Act of 1928 is not applicable to the case where a claim for credit of an overpayment has operated to stay the collection of an outstanding assessment. * * * This office is of the opinion that section 611 of the Revenue Act of 1928 may not be relied upon as a basis for rejecting the taxpayer's claim for refund."

I think the foregoing opinion is correct.

From all the foregoing, especially the contents and statements contained in the claims for credit, it seems to me that, if assumptions are to be indulged in, it is much more reasonable to assume that when the plaintiff prepared the claims for credit and the amended returns, showing the overpayments for 1919, 1920, and 1921, and filed them with the collector, it considered and intended that the commissioner would make the credits within the time required by the statute, especially in view of the fact that the claimed overpayments for these years resulted from carrying forward into subsequent years the adjustments which the commissioner had made in the years 1917 and 1918. The complete amended returns were apparently submitted by the plaintiff with the view and for the purpose of enabling the commissioner to take prompt action. There is nothing to indicate that the plaintiff thought an extended investigation would be necessary, and in my view the plaintiff should not be estopped to question the legality of the credit made after the expiration of the statute of limitation for collection of the outstanding assessment. The only thing that the plaintiff appears to have had in mind in filing the claims for credit and the amended returns, showing the overpayments for the years involved, was to furnish the government with the required information and to protect its rights with reference to the overpayments claimed. It is my opinion that the record does not justify any other conclusion. The plaintiff merely filled in the printed instructions on the claims, inserted the necessary facts required by the claim and the regulations, and set forth at the end of the claim the "appropriate supporting evidence." See article 1033, Regs. 45, and article 1031, Regs. 62. The only place in the claims for credit where there is a request for credit is in the printed portion of item 11 quoted above. The contents of the claims for credit in this case, considered in the light of the commissioner's regulations and decisions, and the testimony of the deputy collector, who was chief of the claims division of the collector's office in Boston, seem to me to refute the conclusion that it was at the request and de-

mand of plaintiff that immediate payment of the additional tax for 1917 and 1918 was not enforced or the government's interest with reference to the deficiencies otherwise protected, and in my opinion demonstrate that the instant case is not one for the application of the doctrine of estoppel.

A deputy collector in the office of the collector at Boston, Mass., since 1919, and who was chief of the claims division of that office, testified that on February 23, 1923, upon receipt of assessment of the additional tax for 1917 and 1918, demand was made for payment and notice given to plaintiff that if the tax was not paid within ten days warrant of distraint would be issued to enforce collection. He further testified that on March 6 the plaintiff paid the total tax assessed for the fiscal year 1916 and $37,458.81 of the additional tax assessed for the fiscal year 1918, having filed on March 5, 1923, claims for credit of alleged overpayments for subsequent years against the additional assessment for 1917 and the balance of the assessment for 1918, whereupon, in accordance with the *usual practice where claims were filed,* the collector's office took no further steps to collect the outstanding tax. See finding 13. He further testified with reference to this matter as follows:

"Q. Upon receipt of that claim for credit, what further action did your office take with regard to the matter of the collection of these deficiencies? A. We took no further action.

"Q. Was that the usual practice in cases of the filing of claims for credit? A. You mean to take no action?

"Q. Yes. A. Yes; that was the usual practice, to take no action.

"Q. Was that the practice universally followed to your knowledge in your office? A. Yes, sir.

"Q. Under whose direction or authority did you presume to act in connection with no further steps to collect the tax? A. Authority derived from the commissioner.

"Q. How, if you know, was that authority conveyed to your office? A. Certain authority contained in the regulation, and in certain mimeograph and Treasury decisions that were issued. * * * In the regulations it is provided that the filing of a claim for abatement may act as a stay in collection of the tax, and the same procedure, as I say, was followed on the claims for credit. * * *

"Q. Now, then, acting as your office did under the authority of the documents that have been introduced, what next step did your office take in connection with the collection or liquidation of those outstanding tax liabilities? A. We took no further action on the 1917 fiscal because that was closed out by two credits that were allowed on Schedule No. 11402."

This witness further pointed out that the 1918 balance was likewise closed out by the same schedule of overassessments, leaving a balance due on the additional tax assessed for 1918 of $11,241.09, which was paid by the plaintiff February 4, 1925, together with interest of $1,292.73. The last-mentioned amount represented interest due on said balance under the statute from March 7, 1923, to February 3, 1925, because the same was not paid within ten days after the notice and demand of February 23, 1923. This witness further testified as follows:

"Q. If I understand your testimony correctly, it is to the effect that after this claim for credit had been filed, your office took no further steps to collect that tax, pending action on that claim for credit. Is that correct? A. Yes, sir.

"Q. Did you communicate with the taxpayer during that time or did you just let him stand there with this demand against him for the payment? A. I have nothing to indicate in our records that we communicated with the taxpayer after sending that first notice and demand. * * *

"Q. * * * In this particular case is there anything at all on your records that would indicate, or from your own knowledge that you can state, that the taxpayer in this case was aware that your office would take no steps to collect that tax pending the action on the claim for credit? A. We have nothing in our records. * * *

"Q. You testified that the practice was that after these claims were filed, not to take any further action to collect the assessment made by the commissioner. A. That was the practice except in cases where we might feel that jeopardy was involved.

"Q. And then you required them to file a bond? A. Yes, sir.

"Q. What is the basis for that practice? Is there a mimeograph on that, or some instructions or something? A. In the regulations it refers to it specifically in connection with claims for abatement, and the collector is charged with the responsibility of collecting taxes, and it is up to him to protect himself if he feels that it is necessary.

"Q. How has that practice grown up? Why should you not go right on, anyhow,

even if the man files a claim for credit and wants the taxes credited against this assessment? You transmit that down to Washington and then you stop your efforts to collect the assessment. Is there any rule or regulation on that? A. That is provided in the regulations, that a taxpayer may file a claim for credit.

"Q. I understand that; but I mean, What is the rule that authorizes you to stop collection? Here you have your assessment list assessing this man for additional taxes, and then he files a claim, and upon the filing of that claim your office stops its regular steps to collect the assessment. Is that not true? A. Yes, sir.

"Q. Why do you do that? A. General practice. * * *

"Q. When a claim for credit is filed is it not your practice to ask for bonds? A. It is not in either abatement or credit, unless we feel that there is jeopardy."

I do not consider it important in this case that plaintiff paid the full amount of the additional assessment of $5,781.39 for the fiscal year ending November 30, 1916, and $37,458.81 of the additional assessment for 1918 at the time it filed its claims for credit. The plaintiff did not question the correctness of the additional tax assessed for 1916, 1917, and 1918. It had agreed to the amounts in conferences with the Bureau of Internal Revenue before the commissioner mailed to it the thirty-day notice on December 19, 1922, as required by section 250 (d) of the Revenue Act of 1921. This fact is disclosed by said letter, which is made a part of paragraph 6 of the stipulation of facts, and in the same letter the commissioner asked the plaintiff to waive the provisions of section 250 (d) of said act giving a taxpayer thirty days to appeal from his proposed deficiency so that the tax might be assessed at once, and on December 29, 1922, plaintiff wrote the commissioner that: "As suggested in your letter, we hereby waive the thirty-day notice of time within which to file an appeal under the provisions of section 250 (d) of the Revenue Act of 1921 from the recommendations contained in that letter." The tax was thereupon assessed. Plaintiff, therefore, had no reason whatever for not paying the amount of the tax for 1916, 1917, and 1918 in excess of the overpayments believed by it to have been made for subsequent years, 1919, 1920, and 1921. Under the established practice the collector of internal revenue certainly would have proceeded to collect this excess, and even if he had not done so, the plaintiff, after

March 6, 1923, would have become liable under the statute for a penalty of 5 per cent. of the excess of the tax assessed over the claimed overpayments and also for interest at the rate of 12 per cent. a year thereon until paid or collected. This was not the case with respect to that amount of the outstanding assessment equal to the claimed overpayment. With respect to the latter amount, no penalty attached and the plaintiff became liable only for interest at 6 per cent. per annum from March 6, 1923, until the amount was finally paid or became barred by the statute.

Section 250 (b) of the Revenue Act of 1921 (42 Stat. 264) was the first provision of law to impose interest on a taxpayer upon a deficiency in tax or a deficiency on each installment, other than the interest imposed for failure to pay within ten days after notice and demand. But this provision only applied to the deficiencies for 1921 and subsequent years and had no application to the years 1916, 1917, and 1918. Had the plaintiff paid the entire additional tax assessed for 1916, 1917, and 1918 on or before March 6, 1923, no interest thereon would have been collectible from it and the government would have been liable to the plaintiff for interest at 6 per cent. per annum on the entire overpayment from the dates paid to the date of the commissioner's allowance. The delay in making collection of the deficiency was therefore to the financial advantage of the United States. Under the practice of the Treasury Department in withholding collection and satisfying such tax by credit, as was attempted in this case, no interest was payable by the government on the overpayments inasmuch as the due date of the tax collected by credit was prior to the dates of the overpayments. The action of the Treasury Department in this case in withholding collection until the tax was collected by the credit, had its construction of the statute of limitation not been erroneous, would have saved the government at least $59,765 in interest which would otherwise have been payable on the overpayments to February 19, 1925, the date of the allowance. This doubtless had something to do with the general practice of the Treasury Department in not making collection of an outstanding tax where an overpayment was claimed as a credit or refund. In some cases the Treasury Department has refused to permit a taxpayer to pay a tax upon notice and demand from the collector where it appeared that there was an overassessment for other years; and it has also refused to recognize as valid an actual payment of an additional assessment, on which the taxpayer was not

liable for interest, as preventing the commissioner from satisfying such additional assessment by a timely credit of an overpayment for other years, on which overpayments the government would have been liable for interest if they had not been credited; and this action of the Treasury officials has been approved. York Safe & Lock Co. v. United States, 40 F.(2d) 148, 69 Ct. Cl. 529, certiorari denied 282 U. S. 839, 51 S. Ct. 21, 75 L. Ed. 745; United States v. Pacific Midway Oil Co.,[1] C. C. H., Vol. III, 1932, para. 9072. Plaintiff's cause of action accrued April 9, 1925, after the enactment of the Revenue Act of 1924, and under section 1019 of that act (26 USCA § 153 note) it would not have been entitled to interest on the overpayments for 1919, 1920, and 1921 had the credit been legal. Inasmuch as the credits were not made until after the tax for 1917 and 1918 was barred, the plaintiff, if judgment were rendered in its favor, could recover interest on the overpayments only from the dates on which the tax for 1917 and 1918 became barred, namely, on $83,623.14, representing an amount equal to the 1917 tax which became barred March 31, 1923, and on $211,527.54, representing an amount equal to the 1918 tax which became barred on June 19, 1924.

I do not think the payment by plaintiff on February 4, 1925, of the excess of the additional assessment, in the amount of $11,241.09, over the overpayments allowed, should affect its right to recover the overpayments illegally credited. Collection of this amount was barred at the time it was paid, but the plaintiff, in all probability, mistakenly relied upon the commissioner's erroneous interpretation of section 250 (d) of the Revenue Act of 1921, that inasmuch as the tax had been timely assessed it could be collected at any time. It was not until February 21, 1927, that this question was finally settled. Bowers v. New York & Albany Lighterage Co., 273 U. S. 346, 47 S. Ct. 389, 71 L. Ed. 676. The government and the courts had different notions about the statute of limitations until the matter was finally settled in the New York & Albany Lighterage Co. Case. The plaintiff may well have had the same erroneous opinion. When plaintiff filed its claim for refund in July, 1930, it was too late to claim a refund of this amount, and, of course, it could not be claimed in this suit.

The mere fact that a person does not immediately institute suit when his cause of action first accrues cannot estop him if the suit is brought within the time allowed by law. In this case the statute allowed plaintiff six years from April 6, 1925, within which to sue for the amounts claimed, and this cause of action was timely instituted. The defendant has lost no rights by the delay.

The majority opinion seems to attach some importance to the fact that the commissioner approved the schedule of refunds and credits, Exhibit K to the stipulation, on February 19, 1925, by signing the authorization to the disbursing clerk of the Treasury Department, although no amount was refundable to the plaintiff. It is stated that: "This is not all, for technically the schedule of refund and credit claims prepared by the collector and transmitted by him to the commissioner finally became effective on February 19, 1925, and of course this schedule, bearing the authorization of the commissioner to the disbursing clerk of the Treasury Department, disclosed no refund due the plaintiff." Treasury Decision No. 3260, December 8, 1921, explains why schedules of refunds and credits are signed and approved by the commissioner, even though such schedules may not show an amount to be refundable. In many cases interest is due upon the amount credited, and although there may be no refund of tax to be made in connection with the credit, the schedule must nevertheless be approved and take its course for the purpose of payment of interest.

The schedule of refunds and credits in evidence shows that when the commissioner approved it the accounts of other taxpayers appeared on it in addition to the account of the plaintiff, and the amounts which were refundable to each of them were cut out of the schedule before that portion thereof relating to the taxpayer in this case was photostated. The schedule in evidence shows that there were at least 54 items of overassessments relating to other taxpayers on the schedule, for it shows that the plaintiff was item 55 thereon. Also, there is a notation in ink upon that portion of the schedule which was photostated, under columns 6 and 7, headed "Interest accrued" and "Total refundable," respectively, which columns were filled in by the commissioner's office instead of by the collector, showing that the total interest accrued in respect of the overpayments disclosed in the schedule was $51,274.51 and that the total amount refundable thereon was $139,275.50. It is also interesting to note that as to the total credit of $295,150.59 in the case of this plaintiff shown on the schedule of refunds and credits, the four credit entries made by the collector making up this total under col-

148

umn 5 of the schedule in the amounts of $65,-806.81, $17,816.33, $180,207.93 and $31,319.-52 were crossed out by a line drawn through them. The schedule also shows that opposite the crossed-out credits there were entered by the commissioner's office under columns 6 and 7 of the schedule entitled "Interest accrued" and "Total refundable" three items of interest payable to plaintiff in the amounts of $6,-792.88 $17,926.44, and $436.76, totaling $25,-156.08. According to the schedule in evidence, the last-mentioned amount was payable to plaintiff by the disbursing clerk. This indicates that the commissioner regarded these credits as illegal, but later concluded not to refund the overpayments or the interest calculated because he thought the taxpayer had not instituted suit within the time required by law, as stated in his letter of September 20, 1930.

The decision of this court in Ralston Purina Company v. United States, 58 F.(2d) 1065, 1068, is not in point. There the commissioner had assessed an additional tax and the collector was proceeding to collect. No overassessment had been determined by the commissioner. No claim for credit was filed. The taxpayer sent the commissioner a telegram and requested him to instruct the collector to withhold collection *until* the commissioner had adjusted subsequent tax years in which the plaintiff believed that there would be overpayments in excess of the tax which the collector was insisting must be paid. The commissioner complied with this request with the result that the collector withheld further steps to make collection of the tax. That decision was given with measured caution upon the peculiar facts, and the court expressly declined to give an opinion upon any but the case in judgment. In that case we distinguished "the ordinary case where the taxpayer files the usual claim for credit" and pointed out that "a claim for credit is directed primarily to the year in which there is an overpayment and operates to protect the rights of the person making it with respect to the statute of limitation for the year of the overpayment," and also pointed out that "the telegram in this case was not a claim for credit but was directed primarily to the collection of the additional tax for 1918." If the telegram in the Ralston Case be regarded merely as a claim for credit, the decision was wrong.

The supplemental opinion on plaintiff's motion for a new trial in Daube v. United States, decided by this court November 14, 1932, is also cited. The quoted statement was made with reference to the plaintiff's contention that at the time the commissioner wrote the collector a letter to apply an overpayment for 1918 and 1919 by Daube, which overpayments had been timely allowed, against a profits tax due by a partnership for 1917, section 1106 of the Revenue Act of 1926 (26 USCA § 1249 note) had extinguished the liability of the partnership. The facts which obtained in that case are distinguishable from the facts in the instant case. The credit involved in the Daube Case was not the usual credit. The usual claim for credit was not filed. The individual gave to the commissioner a written agreement authorizing him to retain overpayments by the individual for 1918 and 1919 in satisfaction of a partnership tax for 1917. My views in that case were separately stated. The facts in the Daube Case, I think, are not parallel to the facts here, and I do not think the reasoning of the majority in the original and supplemental opinions in that case is applicable here.

As I understand the majority opinion in this case it holds that in any case where a taxpayer files a claim for credit specifically claiming overpayments for certain years, fills in the printed portions of the claim which require a statement of any outstanding assessments for other years against which credit is asked, writes into the claim or attaches thereto a statement of facts concerning the years for which assessments are outstanding, and furnishes in or with the claim for credit a detailed statement of facts in support of the claimed overpayments for the years involved, the government may collect such outstanding tax by credit after the expiration of the period of limitation within which such tax could otherwise be collected, and the taxpayer is estopped to question the legality of such collection. Counsel for the government did not go this far in the argument of this case. It was conceded that if this was an ordinary claim for credit the government would have had no right to collect the additional tax for 1917 and 1918 by credit after the expiration of the statute of limitation upon collection. Counsel for the defendant, however, based his argument for estoppel upon the peculiar facts in this case and contended that they disclosed a special and unusual request or understanding by plaintiff not present in the ordinary case of claims for credit that the accounts for all of the years be settled and adjusted by credit, irrespective of the statute of limitation on collection. A careful study of the contents of the claims for credit and the facts and circumstances in the case lead me to the conclusion that there

was nothing peculiar or unusual about the plaintiff's conduct or the statements made in the claims filed. The claims contained nothing more than was necessary fully to comply with the statute and the regulations. The detailed statements made therein appear to me to have been made by plaintiff with no other intent or purpose than of assisting the commissioner and enabling him to take prompt action and in order to protect its rights with reference to the overpayments. Inasmuch as plaintiff and the government were, according to plaintiff's opinion, indebted to each other, it was perfectly natural for plaintiff to desire and expect that the statute would be applied and the amount which had been overpaid would discharge the amounts which it owed. This was the obvious purpose of the statute in making it mandatory upon the commissioner to credit overpayments against deficiencies, but it fixed the time within which he could do this, unless he adopted one of the means available to him to protect the interest of the government with reference to the tax due. Plaintiff made no request for delay upon which the commissioner acted; it manifested no desire, understanding, or agreement that the credit be accomplished beyond the time when it could legally be required to pay the outstanding tax, and we should not assume that either party waived or intended to waive any rights. If assumptions may be made, it seems more reasonable to assume that the plaintiff considered that the collector and the commissioner would protect the government's interests with respect to the outstanding assessment. There was no burden resting upon the plaintiff to sugegst that this should be done or to propose the means of doing it. The means were well known to the collector who employed them whenever he thought necessary. It seems clear to me in this case that the delay in collecting the tax, or otherwise protecting the government's interest, or sooner making the credit, is to be attributed to the opinion of the collector and the commissioner as evidenced by I. T. 1446, supra, that the five-year statute of limitation was not applicable.

Long prior to the filing of claims for credit in this case the commissioner had published a definite ruling that a claim for credit would not operate to stay collection of the tax, if it appeared to be jeopardized by delay. The defendant concedes that if this were a case involving an ordinary claim for credit it could not urge estoppel. What is an ordinary claim for credit? The present case seems to me to be the answer. Complete justification for the statements contained in the claims for credit filed in this case is found in the requirements of the Treasury regulations, and if plaintiff had merely claimed overpayments for 1919, 1920, and 1921, and had made no statement as to the outstanding assessment and had furnished no facts or evidence in the claims as to the reason or grounds of overpayments, its claims would not have complied with the statute or the regulations and the government would have been in a position to reject the claims as insufficient, and, had this action been taken, it would have been able successfully to defend a suit for the overpayments on the ground that the claims were insufficient under the statute and the regulations and did not protect the taxpayer's right to sue for the overpayments.

The result, according to the position of the government, is this: If the taxpayer makes the required statements and furnishes the required information in a claim for credit, he is estopped to question the legality of a credit of the claimed overpayments against a barred deficiency; if he does not fully set forth the required information, he is prohibited by the statute and the regulations from maintaining a suit to recover the overpayments, should the claim be rejected.

The long-continued practice of the department with respect to claims for credit should be taken into consideration. Brewster v. Gage, 280 U. S. 327, 336, 50 S. Ct. 115, 74 L. Ed. 457; Fawcus Machine Co. v. United States, 282 U. S. 375, 51 S. Ct. 144, 75 L. Ed. 397. In Law Opinion 1095, I-1 C. B. 313, the Treasury Department said: "Bearing in mind that the limitations contained in section 250 (d) go only to the remedy and not to the right, it would seem at first blush that if the Government came into possession of money of the taxpayer it might apply it against indebtedness the taxpayer rightly owed to it. It is believed, however, that the expression 'then due' as contained in section 252 is used in a more restricted sense than simply 'owing' and has reference to an enforceable claim on the part of the Government." In this law opinion it was further pointed out that Congress had imposed on the government a definite limit within which to collect taxes in the ordinary way open to it and that it could not be said to have been in contemplation of Congress that a different limitation should prevail in those cases where a taxpayer should perchance make an overpayment; that "to adopt a contrary holding would result in the government in many instances taking advantage of its own wrongdoing, as the section is mandatory and the commissioner is required to apply an overpayment of taxes for one

year to an underpayment for a different year * * *"; and that "the Government itself insists on the benefit of the statute of limitations and holds that a refund due a taxpayer can not be applied on a later tax when the amount refundable is barred by the statute. It is believed that both in good conscience and by legal right the same rule must apply when it works to the advantage of the taxpayer." The principle thus announced is applicable here.

In order to render the rule of estoppel operative it is essential that the party against whom the estoppel is claimed should have acted with knowledge of his rights and have been aware of the facts in respect of the estoppel claimed; also, that the party invoking the estoppel was misled by the acts or conduct of the party against whom the estoppel is claimed; that he changed his position in reliance thereon, and was justified in so doing; and that he was prejudiced thereby, or the party against whom the estoppel is claimed benefited. No estoppel arises where the positions taken are necessarily antagonistic or where the conduct relied on to create the estoppel was superinduced by the acts of the party invoking the doctrine. And in no event can the estoppel be extended beyond the natural and reasonable import of the acts or conduct relied on to create it. To sustain an estoppel in this case the defendant must affirmatively prove and point to facts to establish the above essential elements; if any are lacking, the defense fails. Estoppels are not favored by the law and will be disregarded unless clearly established. I am of the opinion that the facts in this case do not justify the application of the rule.

It seems to me that instead of the government officials being "lulled to sleep by the actions of the plaintiff," they were sleeping on the government's rights with reference to collection for some time prior to the determination and assessment of the tax for 1917 and 1918 and the filing of the claims for credit by plaintiff for 1919 to 1921, and they remained "asleep" to those rights until they were awakened February 21, 1927, nearly four years after the additional assessment of the tax for 1917 and 1918, by the decision in New York & Albany Lighterage Co. v. United States, supra. What they then did is illustrated by decision I. T. 2302, VI-2, C. B. 102, published about July, 1927, and sections 607 to 611 of the Revenue Act of 1928 (26 USCA §§ 2607–2611) which followed. Why did the 1928 act provide that no refund should be made or recovery be had of a tax collected after the running of the statute of limitation where a claim for abatement was filed and, at the same time, provide that the collection by credit after the statute of limitation, where no claim for abatement had been filed in respect of such tax, should be illegal and void? The answer seems obvious. The two claims were designed to serve different purposes. A claim for abatement related directly and wholly to the tax assessed and claimed by the government to be due. A claim for credit related directly and primarily to overpayments claimed by the taxpayer to have been made and the primary purpose of such a claim for credit was to protect the taxpayers' rights to obtain the return of such overpayments after the expiration of the five-year limitation period. Section 252 of the Revenue Act of 1921 (42 Stat. 268) provided that if the commissioner upon examination of any return found that an amount of tax had been paid in excess of that properly due "the excess shall be credited against any * * * taxes, or installment thereof, then due from the taxpayer under any other return, and any balance of such excess shall be immediately refunded to the taxpayer: Provided, That no such credit or refund shall be allowed or made after five years from the date when the return was due, unless before the expiration of such five years a claim therefor is filed by the taxpayer." The intent and purpose in providing in sections 607 to 611 of the Revenue Act of 1928 that no refund should be made where a claim for abatement had been filed, but that a credit made after the expiration of the limitation period on collection should be void, were, I think, the result of the difference in the nature and purpose of the two claims. In view of such difference in the claims and in view of the fact that the statute made it mandatory upon the commissioner to credit any overpayments against any tax due, it was not thought proper to deprive the taxpayer, who had only filed a claim for credit of overpayments, of the benefit of the statute of limitation on collection where the commissioner failed, because of the department's erroneous interpretation of the limitation in the statute, to make such credit within the time required.

The majority opinion does not expressly hold that the claims for credit in this case constituted a waiver of the statute of limitation for collection of the additional assessments. This point was urged by the defendant. I am clear that such holding is not justified by the record. National Refining Co. of Ohio et al., 1 B. T. A. 236; Peerless Paper Box Mfg. Co. v. Routzahn (D. C.) 22 F.

(2d) 459; National Tool Co. v. Routzahn (D. C.) 28 F.(2d) 914. The Revenue Act of 1921 provided for waivers as well as for claims for credit, and it is clear that it was not intended that one should accomplish the purpose of the other. A "waiver" is the voluntary relinquishment of a known right and the facts must leave no doubt that the person who, it is claimed, waived said rights intended to do so.

There is another reason which alone seems to me to be sufficient to justify the position taken by the plaintiff in this case that the claims for credit did not give the government the right to collect the tax for 1917 and 1918 after the expiration of the period of limitation relating thereto.

In December, 1925, this court decided the case of Toxaway Mills v. United States, 61 Ct. Cl. 363, in which it was held that: "Where an additional tax has been assessed and collected and the plaintiff pleads the statute of limitation, it is not entitled to recover unless it can show by sufficient proof that the Government was never liable for the tax." This decision was reversed March 14, 1927, 273 U. S. 781, 47 S. Ct. 471, 71 L. Ed. 889. Section 1106 of the Revenue Act of 1926, approved February 26, 1926, contained a provision that: "The bar of the statute of limitations against the United States * * * shall not only operate to bar the remedy but shall extinguish the liability; but no credit or refund in respect of such tax shall be allowed unless the taxpayer has overpaid the tax. The bar of the statute of limitations against the taxpayer * * * shall not only operate to bar the remedy but shall extinguish the liability; but no collection in respect of such tax shall be made unless the taxpayer has underpaid the tax."

On February 21, 1927, the Supreme Court decided the case of Bowers v. New York & Albany Lighterage Co., supra, in which it was held that a taxpayer could recover a tax collected after the expiration of the statute of limitation. This decision did not construe section 1106 of the Revenue Act of 1926. Thereafter, in or about July, 1927, the Treasury Department, by reason of the aforementioned decisions and the ambiguity of section 1106 of the Revenue Act of 1926, published the following ruling I. T. 2382, VI-2 C. B. 102: "In view of the great uncertainty as to the whole matter, it is believed that no action toward making a refund should be taken by the bureau in reliance upon the New York & Albany Lighterage Co. Case unless and until the situation is clarified by further court decisions or by legislative action. The

problem is already under consideration by the Joint Committee on Internal Revenue Taxation, and it will be presented to the Congress as soon as it convenes for such action toward a clarification of the situation as it deems proper." The result was the enactment in the Revenue Act of 1928, approved May 29, 1928, of sections 607, 608, 609, 610, 611, and the repeal, as of February 26, 1926, of section 1106 (a) of the Revenue Act of 1926 by section 612 (26 USCA § 2612 note). Cf. Graham & Foster v. Goodcell et al., 282 U. S. 409, 51 S. Ct. 186, 75 L. Ed. 415. Section 607 provided that any tax assessed or paid, whether before or after the enactment of that act, after the expiration of the period of limitation properly applicable thereto, should constitute an overpayment and should be credited or refunded if claim therefor was filed within the period of limitation for filing such claim. Section 609 provided that any credit against a tax in respect of any taxable year shall be void if any payment in respect of such liability would be considered an overpayment under section 607. This section was also made retroactive. Section 611 provided that if any tax was within the period of limitation properly applicable thereto assessed prior to the enactment of the Revenue Act of 1924, and if a *claim in abatement* was filed, with or without bond, and if the collection of any part of the tax was stayed then the payment of such part made before or within one year after the enactment of section 611 should not be considered an overpayment under the provisions of section 607 relating to payments made after the expiration of the period of limitation on assessment and collection. Section 611 was enacted because of the practice which had been followed by the Treasury Department not to make collection in respect of a tax which had been assessed where a claim in abatement had been filed, or to require a bond or waiver with respect thereto. This practice was founded on Treasury ruling I. T. 1446, in or about July, 1922, that where a tax had been assessed within the statute of limitation applicable thereto, collection thereof after the expiration of the five years was entirely proper and that the collector could proceed by means of distraint to collect such tax, notwithstanding the expiration of the five-year limitation period. This decision of the Treasury Department applied as well to collection of a tax by credit after the expiration of the statute of limitation. This practice was followed whether the tax was collected by credit or by distraint. G. C. M. 6296, supra. The statutes which had pro-

vided for claims for abatement had also provided for claims for credit, and the purpose and effect of these claims were well known. When, therefore, the Revenue Act of 1928 provided that a tax timely assessed and collected after the expiration of the statute of limitation should not be refunded if a claim in abatement had been filed, and, at the same time, provided that a collection by credit after the expiration of the statute of limitation should be *void,* it seems clear to me that it was not intended to authorize the commissioner to collect an outlawed tax by credit where the taxpayer had filed a claim for credit in accordance with the statute and the regulations, notwithstandnig the collection of the tax mentioned in the credit claim was postponed or stayed because of erroneous interpretation of the statute to the effect that if the tax was assessed in time it could be collected after the expiration of the five-year period of limitation. This is the construction which the Treasury Department placed upon the Revenue Act of 1928 in its published opinion G. C. M. 6296, supra. See, also, G. C. M. 5739, VIII–1 C. B. 127.

I cannot agree with the conclusion of the majority opinion that "sections 607 and 609 of the Revenue Act of 1928, heretofore quoted, apply in cases where the Commissioner acts independently of the taxpayer in the absence of a request, or conduct upon the part of a taxpayer, to proceed differently." I am of opinion that when section 609 of the Revenue Act of 1928 provided that *any credit* against a liability shall be *void* if any payment in respect of such liability would be considered an overpayment under section 607, the words "any credit" were used in the light of the statutes and the departmental practice requiring claims for credit. By "any credit" I do not think the statute meant "any credit *except* one for which a claim has been filed."

When the Revenue Act of 1932, approved June 6, 1932 (47 Stat. 173 [26 USCA § 3001 et seq.]), was under consideration by the Finance Committee of the Senate, section 1107, entitled "Credits of overpayments," was inserted as amendment 262, as follows:

"(a) If any internal-revenue tax was, within the period of limitation properly applicable thereto, assessed prior to June 2, 1924, and if a claim was filed, or a request in writing made, for a credit against the tax so assessed of an amount claimed as an overpayment of internal-revenue tax, and if collection of any part of the tax so assessed was postponed, then (1) a credit (made prior to May 29, 1928) against the tax so assessed shall not be considered as void under the provisions of section 609 (a) of the revenue act of 1928, relating to erroneous credits, and (2) the payment (made prior to May 29, 1928) of the part of the tax the payment of which was so postponed shall not be considered as an overpayment under the provisions of section 607 of the revenue act of 1928, relating to payments made after the expiration of the period of limitation on assessment and collection.

"(b) As used in subsection (a), the term 'tax' includes any interest, penalty, additional amount, or addition to any internal-revenue tax."

The manifest purpose of this proposed section was to apply the same rule to claims for credit that the 1928 act had applied to claims for abatement, inasmuch as the practice with reference to collection of the outstanding tax had theretofore been the same in both cases. See G. C. M. 6296, supra. The bill containing the above-quoted section was passed by the Senate, but the section was stricken out in conference and the report of the conference, No. 1492, 72d Congress, First Session, stated, on page 29: "This amendment provides that in certain cases where, by reason of the filing of a claim or request for credit, the collection of an assessed tax was postponed, any credit against the tax so assessed shall not be considered void and any payment of part of the tax, payment of which was so postponed, shall not be considered as an overpayment; and the Senate recedes." I do not think the courts should hold a taxpayer estopped to recover an admitted and allowed overpayment merely because he had filed the statutory claim for credit therefor when Congress was not willing so to provide by statute when it had the specific question under consideration.

I am of opinion that judgment should be entered for the plaintiff.